UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| KHATRI CHHETRI SHER BAHADUR | § | EP-19-CV-00357-DCG |
| | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

On January 30, 2020, the Court held an evidentiary hearing on the Government's request for an extension of its authorization to administer involuntary medical care, involuntary hydration in the form of IV fluids, and involuntary nutrition in the form of nasogastric tube ("NG") placement with necessary enteral feedings to Respondent Khatri Chhetri Sher Bahadur ("Respondent"). *See* ECF No. 29. After the hearing, the Court issued an order extending the Government's authorization. ECF No. 28. Therein, the Court noted that it would include its reasoning for granting the order in a forthcoming memorandum opinion and order. *Id.* In view thereof, the Court issues the following memorandum opinion and order.

### I. BACKGROUND

Respondent is a citizen of Nepal who entered the United States on or about May 23, 2019 without inspection near El Paso, Texas. Govt's Ex Parte Mot. at 1, ECF No. 1. On November 4, 2019, an immigration judge ordered Respondent removed to Nepal. *Id.* Respondent filed an appeal before the Board of Immigration Appeals ("BIA") that is currently pending. *Id.* at 2. Respondent is currently detained in a detention facility operated by Immigration and Customs Enforcement ("ICE") and engaged in a hunger strike. *Id.* Respondent states that his hunger strike will continue until he is released. ECF No. 22 at 15. Respondent's first documented missed meal was dinner on November 19, 2019. Govt's Ex Parte Mot. at 2. ICE placed

Respondent on official hunger strike protocol and under the care of a doctor under contract with ICE ("ICE Doctor") after Respondent missed his ninth meal on November 22, 2019. *Id.*

On December 6, 2019, the Government filed an *ex parte* motion for authorization to provide involuntary medical care, hydration, and nutrition. *Id.* at 1. Along with its motion, the Government submitted a declaration from the ICE Doctor in which she noted that intrusive medical procedures were necessary to preserve Respondent's life and health after serious medical complications arose from Respondent's hunger strike. *Id.* 2–3, 18. That same day, ICE transported Respondent to a local hospital in El Paso ("First Hospital") to have the NG tube placed because the ICE Doctor was out of town. ECF No. 3 at 1.

On December 6, the Court granted the Government's *ex parte* motion and issued an order authorizing medical providers under contract with ICE to perform involuntary medical care, hydration, and nutrition, for thirty days, under the appropriate standards of medical care consistent with medical practice. ECF No. 2 at 3. The Court ordered that a medical doctor from the First Hospital be physically present during the involuntary medical care, hydration, and nutrition performed by the medical staff to personally supervise, evaluate, and ensure that any such procedures were performed within the appropriate standards of care.[1] *Id.* The Court further ordered that Respondent would remain at the First Hospital under adequate medical care and treatment until the ICE Doctor and the medical doctor from the First Hospital, who was present at the placement of the NG tube, were both satisfied that Respondent's medical condition had improved and they had devised all necessary medical logistics to transfer him back to the ICE

---

[1] The Court ordered the physical presence and supervision of a medical doctor during such procedures after it learned that another respondent in a similar matter had severe complications after nurse practitioners placed the NG tube unsuccessfully twice due to the tube coiling—resulting in the tube failing to enter that respondent's stomach, his nose to start bleeding, and his inability to breathe. *See In re Kumar*, 402 F. Supp.3d 377, 380 (W.D. Tex. 2019).

facility. *Id.* The Court also ordered the Government to appraise the Court on Respondent's medical condition on a weekly basis for the duration of this matter. *Id.* Also, on December 6, the Court contacted the offices of a bank of local attorneys, who had previously indicated their willingness to volunteer to represent respondents in these cases, in search for volunteers to represent Respondent in this matter. ECF No. 30 at 1. On December 9, 2019, Mr. Joseph Veith voluntarily appeared on Respondent's behalf. *Id.*

Respondent was discharged from the First Hospital on December 11, 2019 and transported back to the ICE facility. ECF No. 3 at 3. On December 23, while ICE medical personnel were performing a blood draw for Respondent's weekly laboratory work, Respondent became unresponsive, and his respiratory rate dropped to approximately a third of its normal rate. ECF No. 8 at 2. Emergency medical services transported Respondent to a second local hospital in El Paso ("Second Hospital"). *Id.* Respondent was discharged from the Second Hospital after he was in stable condition and transferred back to the ICE facility on December 26. ECF No. 23 at 2.

On December 30, the Government filed a "Motion for Extension of Order of Authorization" (ECF No. 10), seeking to extend the authorization to perform the involuntary procedures for another thirty days. The Court granted the Government's motion and set an evidentiary hearing on January 13, 2020 to determine whether the authorization should remain in place. ECF No. 11. During the days before the evidentiary hearing, the parties exchanged medical expert reports on Respondent's medical condition and care. ECF No. 14 at 1. On January 7, 2020, Respondent was transferred again to the Second Hospital as a precautionary measure after he presented low blood pressure. ECF No. 23 at 2. After his condition was deemed stable that same day, he was transferred back to the ICE facility. *Id.*

On January 10, 2020, the Government moved for a second extension of the authorization to perform the involuntary procedures and to reset the evidentiary hearing until both parties had adequate opportunity to respond to each other's medical expert reports. ECF No. 13. That same day, the Court granted the Government's motion and reset the evidentiary hearing to January 30, 2020. ECF No. 14. On January 13, Respondent was transported to the First Hospital to have his NG tube replaced because the First Hospital would place a 12-french NG tube instead of a 16-french NG tube that ICE would have placed at its facility.[2] ECF No. 23 at 3. On January 21, Respondent had a cough with blood-tinged phlegm, for which he underwent a speech therapy evaluation and was later advised that the cough resulted from irritation to his throat because of the NG tube. *Id.* at 4. On January 27, Respondent was discharged from the First Hospital and transferred back to the ICE facility, where he continues to receive the involuntary procedures and medical staff has continued to monitor his weight. ECF No. 33 at 4. As of today, Respondent is on day 95 of his hunger strike.

## II. DISCUSSION

During the evidentiary hearing, the Government sought to extend its authorization to administer involuntary medical care, hydration, and nutrition to Respondent for another thirty days. ECF No. 29. The Government presented witness testimony from the ICE Doctor and an ICE Medical Expert to show that it had complied with the Court's previous authorization order and the involuntary procedures were performed under the appropriate medical standards of care.

---

[2] At the hearing, the ICE Doctor testified that she decided to take Respondent to the First Hospital as an accommodation to Respondent asked her if it was possible for him to get his NG tube replaced with one of the same size he had at that time. The ICE Doctor testified that Respondent preferred the 12-french NG tube to the 16-french tube that he would have received if the replacement had taken place at the ICE facility.

Respondent argued that the Court should not extend the Government's authorization because the Government failed to comply with the Court's previous order after the involuntary procedures were not performed under the appropriate standards of care. Specifically, Respondent brought the declaration of his own medical expert witness, Parveen Parmar, M.D. MPH[3], who reviewed ICE's medical records on Respondent's medical condition, and reached the conclusion that Respondent was receiving substandard care while in ICE custody. Parmar Report, ECF No. 22.

### A. Jurisdiction and Case Assignment

As a threshold matter, the Court will briefly address why it has jurisdiction to consider this matter before reaching the merits of the parties' contentions. The Government filed the instant matter as a sealed miscellaneous case when it first filed its *ex parte* motion for authorization. Govt's Ex Parte Mot. at 1. In its motion, the Government relied on the All Writs Act, 28 U.S.C. § 1651, as its jurisdictional basis to request authorization from the Court to administer the involuntary procedures to Respondent. *Id.*

First, the Government must file this type of matter as a civil action, not a miscellaneous case. According to the chapter on Intake and New Cases of the District Court Clerk's Civil Manual for this district, "[m]iscellaneous cases can be a variety of matters filed with the court

---

[3] Dr. Parmar is an American physician licensed in California who practices in the Los Angeles County and the University of Southern California Emergency Department. She is also an Associate Professor of Clinical Emergency Medicine at the University of Southern California, and Chief of the Division of Global Emergency Medicine at the Keck School of Medicine, University of Southern California. She teaches emergency medicine, teaching both medical students and residents. She regularly cares for detained patients in the USC Jail Emergency Department and is thus familiar with standards of care for the provision of health care in detention. Prior to her current position, she taught emergency medicine to medical students at Harvard Medical School, and residents in the Harvard Affiliated Emergency Medicine Residency program, where she taught coursework specific to the health of refugees and asylum seekers, global health, and humanitarian aid. She also has experience reviewing multiple records of health care delivered specifically in ICE detention and she is familiar with the standards of care in this setting, including the ICE Performance-Based National Detention Standards 2011 (as revised in 2016). Parmar Report at 1.

that are not considered a civil or criminal case. These matters, however, may be indirectly or directly related to a civil or criminal case." *Miscellaneous Cases*, Intake & New Cases, W.D. Tex. Civ. Manual (revised 2019). These miscellaneous actions are "ancillary proceedings which are not defined as civil actions unless they are contested before a District Court Judge." *Id.* The Manual's definition of "miscellaneous cases" appears consistent with other district courts' definitions of the same term. *See, e.g., Robinson v. Ct. Clerks, E. Dist. of California, Sacramento*, CIV 11-2679 JAM EFB, 2012 WL 219147, at *2 (E.D. Cal. Jan. 24, 2012) (noting that the Local Rules of the Eastern District of California define "miscellaneous case" as "a number assigned to an ancillary or supplementary proceeding not defined as a civil or criminal action."); *Dean v. Sec. of Georgia*, 1:08-CV-2129-JEC, 2009 WL 10690516, at *27 (N.D. Ga. Mar. 25, 2009), *aff'd sub nom. J.P. Morgan Chase Bank v. Dean*, 364 F. App'x. 611 (11th Cir. 2010) ("Miscellaneous numbers are normally assigned to a variety of matters filed with the court which are not considered a civil or criminal case. These matters, however, may be directly or indirectly related to a civil or criminal case. Miscellaneous actions are used for administrative matters that require resolution through the judicial system."); *Smith v. Haynes*, 3:05CV130, 2008 WL 276492, at *1 (N.D.W. Va. Jan. 29, 2008) ("[P]etitioner is advised that miscellaneous cases are generally those that contain administrative matters that require resolution through the court system, but that cannot be considered either a civil or criminal case.").

While it appears to be neither a civil or criminal case on its face, the instant matter cannot be filed as a miscellaneous case because it is not an ancillary proceeding that is directly or indirectly related to a civil or criminal case. Respondent is neither a criminal defendant, nor a civil litigant before the Court. Further, while this matter could be, at best, considered ancillary to Respondent's removal proceedings, it still cannot be filed as a miscellaneous case because

Respondent's appeal is an administrative proceeding pending before the BIA, not the Court. Gov't's Ex Parte Mot. at 1. Indeed, the Court has no jurisdiction over Respondent's removal proceedings because it is precluded from reviewing them under 8 U.S.C. § 1252(g). *Williams v. Mason*, 131 F. App'x. 49, 50 (5th Cir. 2005); 8 U.S.C. § 1252(g) ("[N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."). If, however, Respondent had a habeas corpus petition pending before the Court, then the instant matter could be properly filed as a miscellaneous case that was ancillary and directly or indirectly related to Respondent's habeas petition. But without a pending civil or criminal action involving Respondent, the Government may only properly file the instant matter as a civil action for the relief it seeks.

Further, the Government need not file this type of civil action under seal because of the action's underlying emergency to preserve Respondent's life. Specifically, the Government's chief contention for filing this action under seal is because of the highly sensitive and personal nature of Respondent's personal health information. To be sure, Respondent has a privacy interest in his personal health information under HIPAA, 42 U.S.C. §§ 1320d *et seq.* But, because Respondent's hunger strike presents a serious threat to his health and safety, the Government is allowed to disclose Respondent's personal health information in its filings as a necessary means "to prevent or lessen a serious and imminent threat." 45 C.F.R. § 164.512 ("A covered entity may, consistent with applicable law and standards of ethical conduct, use or disclose protected health information, if the covered entity, in good faith, believes the use or disclosure . . . [i]s necessary to prevent or lessen a serious and imminent threat to the health or safety or a person[.]"). If the Government wishes to redact other information, such as the

personal identifying information of its employees for safety concerns, or for any other purpose, the Government must file for leave of the Court to file a document under seal and state the factual basis and argument for the requested sealing order. W.D. Tex. CV-5.2(c).

Second, the All Writs Act does not provide the Court jurisdiction over this type of matters. The All Writs Act grants to all courts created by Congress the power to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Yet, the Act does not itself create or expand a court's jurisdiction because it only grants to a court power "in aid of" protecting the court's *existing* jurisdiction. *Clinton v. Goldsmith*, 526 U.S. 529, 534–36 (1999); *Brittingham v. U.S. Comm'r. of Internal Revenue*, 451 F.2d 315, 317 (5th Cir. 1971). A court may not just issue a writ under the Act "in aid of" its existing jurisdiction, but rather, may only issue such writs if they are also "agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). In determining whether a writ is "agreeable to the usages and principles of law," a court must examine the common law and other "usages and principles" that have constrained the issuance of such writs "down through the years." *Rawlins v. Kansas*, 714 F.3d 1189, 1196 (10th Cir. 2013); *Ivey v. Harney*, 47 F.3d 181, 185 (7th Cir. 1995); *Jones v. Lilly*, 37 F.3d 964, 968 (3d Cir. 1994). As such, writs issued under the Act are considered "extraordinary measures" and are not a preferred remedy, even more so when adequate, alternative remedies at law or other measures exist that a court may use to resolve an issue without resorting to a writ. *Goldsmith*, 526 U.S. at 537; *In re Gee*, 941 F.3d 153, 158 (5th Cir. 2019).

Therefore, the Court cannot simply authorize the involuntary procedures under the Act because no independent jurisdiction exists for which the Court can issue a writ "in aid of" to protect. The Court must derive jurisdiction over this matter from another source, such as another

federal statute or the Constitution. *See Kokkonen v. Guardian Life Insurance Co., of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute . . . ."). To ascertain whether a jurisdiction basis exists here, the Court must first define the type of action the Government intended to present.

Here, the Government sought authorization for a specific course of conduct to maintain the status quo until the resolution of Respondent's removal proceedings—namely, to prevent Respondent's death by providing him with involuntary medical care, hydration, and nutrition until the BIA decides Respondent's appeal. Courts already provide litigants such type of relief in civil actions in the form of preliminary injunctions and temporary restraining orders ("TROs"). *See Univ. of Tex. v. Camenish*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Loc. No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974) ("[U]nder federal law[,] [TROs] should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."). Preliminary injunctions and TROs are usually prohibitory and seek only to maintain the status quo pending a trial or hearing on the merits. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006). But as traditional tools of equity, preliminary injunctions and TROs can also be mandatory—in other words, they can order a party to perform an affirmative act or mandate a specific course of conduct to "compel the performance of a duty." *Id.*; *State of Ala. v. United States*, 304 F.2d 583, 590 (5th Cir. 1962), *aff'd sub nom. Alabama v. United States*, 371 U.S. 37 (1962). As such, the Government seems to request a mandatory injunction to preserve Respondent's life pending his deportation proceedings in compliance with its duty under 8

U.S.C. § 1231(f)—authorizing the Attorney General, through ICE, to provide medical treatment to aliens who require it during removal proceedings. 8 U.S.C. § 1231(f).

Considering the above, the Government should have started a civil action seeking a TRO and preliminary injunction by filing a complaint against Respondent, who by his hunger strike, is obstructing the Government from fulfilling its duty imposed by 8 U.S.C. § 1231(f). *See* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."). As a plaintiff starting a civil action, the Government can then invoke 28 U.S.C. § 1345 to provide the Court with subject matter jurisdiction. *See* 28 U.S.C. § 1345 ("Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."). Along with its complaint, the Government should have filed a separate application for a TRO. *See* W.D. Local R. CV-65 ("An application for a [TRO] or preliminary injunction shall be made in an instrument separate from the complaint."). Recent cases addressing the same issues filed in other federal courts have followed this same format. *See, e.g.*, *United States v. Akrawi*, 2:17-cv-02192-PHX-DGC (D. Ariz. July 7, 2017); *United States v. Gluschchenko*, 2:19-cv-04678-PHX-SPL (JFM) (D. Ariz. July 10, 2019); *United States v. Manbeer Singh*, 1:19-cv-01530-DDD-JPM (W.D. La. Nov. 27, 2019); *United States v. Vikas Kumar*, 1:19-cv-01483-DDD-JPM (W.D. La. Nov. 15, 2019); *United States v. Pardeep Kumar*, 1:19-cv-01549-DDD-JPM (W.D. La. Dec. 4, 2019); *United States v. Shirdh-Davi*, 1:19-cv-01550-DDD-JPM (W.D. La. Dec. 4, 2019); *United States v. Raza*, 1:19-cv-01551-DDD-JPM (W.D. La. Dec. 4, 2019); *United States v. Suresh Kumar*, 1:19-cv-01604-DDD-JPM (W.D. La. Dec. 17, 2019).[4]

---

[4] At the hearing, the ICE Expert testified that, in comparison to ICE, the Bureau of Prisons does not require court orders to authorize its staff to administer these involuntary procedures to their inmates.

While the Government did not initially style and file the instant matter in the form described *supra*, it did include a discussion, to some extent, in its motion of the four factors governing requests for an injunction or TRO, including: (1) the likelihood that the Government will succeed on the merits; (2) the potential for irreparable harm if the Court does not issue the injunction or TRO; (3) the balance between the injury that the Government seeks to avoid and any hardship that the injunction or TRO would cause to Respondent; and (4) the effect, if any, that the Court's ruling will have on the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To save the litigants additional legal expenses and avoid unnecessary expenditure of judicial resources, the Court construes the instant matter as a civil action seeking a mandatory preliminary injunction under Federal Rule of Civil Procedure 65.[5] Any subsequent motions to extend the authorization to administer the involuntary procedures in this case will be construed as motions for preliminary injunction with a limited duration of thirty days.[6]

---

However, as discussed more in detail *infra*, the Court is of the view that ICE must still request authorization via court order because civil immigration detainees—like Respondent—are not criminal defendants serving prison sentences, and thus, they are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982).

[5] The Court's construction of the Government's emergency *ex parte* motion is limited to the unique circumstances of this case. All future emergency motions for authorization that the Government wishes to file for other respondents, if any, must be styled and filed according to the instructions set herein.

[6] Injunctions in this type of matter must be of limited duration to afford these civil immigration detainees an opportunity to be heard and challenge the injunction at the hearing under due process. *See Application of Eisenberg*, 654 F.2d 1107, 1112–13 (5th Cir. 1981) ("Due process is a flexible concept. The lesser the interest of which a person stands to be deprived, the fewer the procedural safeguards afforded to him by the Constitution."). Indeed, involuntary medical care, hydration, and nutrition are temporary infringements upon the detainees' liberty under emergency circumstances prompting invasive intervention by the Government to avoid serious harm to the detainees' themselves. *See In re Saenz*, 728 N.W.2d 765, 775–76 (Wis. Ct. App. 2007) ("We conclude that a court may enter a temporary ex parte order, provided the Department establishes by way of affidavit, as it did in this case, that exigent circumstances exist requiring immediate involuntary treatment in order to avoid serious harm to or the death of an inmate. The duration of any ex parte order to forcibly feed and hydrate an inmate, however, should be only for as long as reasonably necessary to allow the court to conduct a hearing on the Department's petition. In so concluding, we perceive the present circumstances to be analogous to others

Accordingly, the Court concludes that it has jurisdiction over the instant civil action. The Court will now address the merits of the instant action.

### B. Substantial Likelihood of Success on the Merits

In determining the Government's likelihood of success on the merits, the Court first addresses what is the correct applicable standard to evaluate the constitutionality of the administration of involuntary medical care, hydration, and nutrition to detainees in the civil immigration context.

#### 1. Applicable Standard in the Civil Immigration Context

In its motion, the Government averred that the Supreme Court's four-factor test from *Turner v. Safley*, 482 U.S. 78 (1987), and not the balancing test from *Youngberg v. Romeo*, 457 U.S. 307 (1982), is the proper standard to evaluate its motion for authorization. But during the evidentiary hearing, Respondent did not contest such argument because he argued that regardless of which standard was applied, the Court would still consider the same circumstances, ultimately muddling the finer distinctions between the tests. For the reasons that follow, the Court holds that neither the *Turner* four-factor test, nor the *Youngberg* balancing test applies. Instead, the Court concludes that the test from *Bell v. Wolfish*, 441 U.S. 520 (1979), is the correct applicable standard in this type of cases.

In *Youngberg*, the Supreme Court addressed whether a mentally disabled individual involuntarily committed to a state institution had substantive rights under the Due Process Clause of the Fourteenth Amendment to "(i) safe conditions of confinement; (ii) freedom from bodily restraints; and (iii) training or 'habilitation.'" *Youngberg*, 457 U.S. at 309. The Supreme Court

---

where a temporary infringement upon a person's liberty is permitted under emergency circumstances that require prompt intervention by government actors in order to avoid serious harm to the person or others.").

held that the mentally disabled individual retained liberty interests in safety and freedom from bodily restraint, but that those interests were not absolute. *Id.* at 319–20. For example, the state institution had on occasion to restrain the movement of its residents to protect them and others from violence to ensure their health and safety. *Id.* at 320. Thus, the Supreme Court stated that "[i]n determining whether a substantive right protective by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" *Id.* (quoting *Poe v. Ullman*, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)). Put differently, the Supreme Court indicated that the individual's interest in liberty must be weighed against the Government's asserted reasons for restraining individual liberty. *Id.* Yet, the Supreme Court did emphasize that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 322.

Meanwhile, the Supreme Court in *Turner* held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. To determine whether a prison regulation was reasonable, the Supreme Court established the following four-factor test: (1) whether a valid, rational connection between the prison regulation and the legitimate governmental interest existed; (2) whether alternative means of exercising the asserted constitutional right remained open to the prisoner; (3) whether the extent of the accommodation of the prisoner's asserted right would have an impact on prison staff, other prisoners, and the allocation of resources; and (4) whether the presence of ready alternatives undermines the reasonableness of the regulation, or if the regulation is an "exaggerated response" to penal concerns. *Id.* at 89–91. The Supreme Court applied this four-factor test to two prison regulations: one that barred inmate-to-inmate

correspondence and another that restricted inmate marriage. *Id.* at 91. The correspondence

regulation was upheld because it logically advanced the goals of institutional security and safety

identified by the prison officials. *Id.* at 93. However, the marriage regulation was struck for lack

of a valid, rational connection between the regulation and a legitimate government interest

because it was overboard and not reasonably related to an articulated rehabilitation goal. *Id.* at

99.

Federal courts are currently split on whether *Turner* or *Youngberg* is the proper

applicable standard when considering whether administering involuntary medical care,

hydration, and nutrition to a civil immigration detainee is constitutional. The majority of courts

have applied the *Turner* standard because the first case to uphold these involuntary procedures in

the civil immigration context, *In re Soliman*, 134 F. Supp. 2d 1238 (N.D. Ala. 2001), did so, but

these courts did not expand on their reasoning to do so. *See e.g.*, *In re Fattah*, 3:08-MC-164,

2008 WL 2704541, at \*3–4 (M.D. Pa. July 8, 2008) (discussing the *Soliman* opinion and using

the *Turner* factors without addressing other alternative standards); *Dep't of Homeland Sec. v.

Ayvazian*, 15-23213-CIV, 2015 WL 5315206, at \*4 (S.D. Fla. Sept. 11, 2015) (discussing the

*Turner* four-fact test and equating immigration detention centers with prisons without

explanation); *United States v. Glushchenko*, CV1904678PHXSPLJFM, 2019 WL 3290334, at \*2

(D. Ariz. July 22, 2019) (followed *Soliman*, *Fattah*, and *Ayvazian* in applying *Turner* and

rejected *Youngberg* because respondent failed to offer any reasoning as to why *Turner* was

inadequate to evaluate and safeguard the interests of a civil detainee).[7] To further complicate

matters, the *Soliman* court applied *Turner* to the civil immigration context without explaining its

---

[7] Another case that is cited alongside *Soliman, Fattah,* and *Ayvazian* in applying the *Turner* four-factor test is *Aamer v. Obama*, 742 F.3d 1023, 1038–39 (D.C. Cir 2014). However, *Aamer* is inapposite to the civil immigration context because it dealt with involuntary nutrition to enemy combatants detained in Guantanamo Bay, not civil immigration detainees awaiting removal.

reasoning for doing so, and thus, no explanation exists as to why *Turner* is particularly applicable to civil immigration detainees. *Soliman*, 134 F. Supp. 2d at 1253–54. On the other side of the spectrum, *In re Kumar*, 402 F. Supp. 3d 377 (W.D. Tex. 2019), is the only reported case rejecting *Turner* and applying *Youngberg* instead. *See also In re Karan Pal Singh*, EP-19-MC-343-KC (adopting the *Kumar*'s court opinion as to the *Turner* standard). The *Kumar* court based its reasoning on the fact that since civil immigration detainees were not criminal defendants serving prison sentences to be punished, then *Turner*'s penological interests were inapposite for detentions in the civil immigration context. *Kumar*, 402 F. Supp. 3d at 383.

After careful review, the Court disagrees that either of those standards is the correct one to apply here. To be sure, "[w]ords matter—a detainee is not a prisoner." *Kumar*, 402 F. Supp. 3d at 383. Respondent was not convicted of a crime for which the Government seeks to punish him. Hence, "the penological interests presented in *Turner* are inapposite to the merits of this action," *id.*, and Respondent is "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 322. However, nor is Respondent a "mentally [disabled] individual" whose weak medical condition arose from his "lack of most basic self-care skills." *Id.* at 309. Indeed, Respondent is a "competent civil detainee", *Kumar*, 402 F. Supp. 3d at 383, and his weak medical condition is the result of a hunger strike that he deliberately and consciously decided to undertake. *See* Govt's Ex Parte Mot. at 3 ("[Respondent] has no past mental health history or chronic medical conditions. . . . He states he is on his self-imposed hunger strike due to his discontent with his continued detention in ICE custody and dissatisfaction with his immigration case). As such, Respondent's status as a civil immigration detainee lies in between a mentally disabled individual involuntarily committed to a state institution, as in *Youngberg*,

and a criminal defendant serving a prison sentence, as in *Turner*. To that end, the Court is of the view that the Supreme Court's test from *Bell* is the correct standard because Respondent's status as a civil immigration detainee awaiting the resolution of his removal proceedings is more akin to that of a pretrial detainee awaiting trial.[8]

In *Bell*, the Supreme Court examined the constitutional rights of pretrial detainees and evaluated the constitutionality of the conditions and restrictions of pretrial detention. *Bell*, 441 U.S. at 523, 535. The Supreme Court emphasized that it was not concerned with the constitutionality of detaining a detainee prior to an adjudication of guilt, but only with the constitutionality of the conditions and restrictions of pretrial detention while the detainee awaits trial. *Id.* at 535. In determining whether a condition or restriction of pretrial detention is constitutional, the Supreme Court held that "[a] court must decide whether the [condition or restriction] is imposed for the purpose of punishment or whether it is but an incident of some

---

[8] The *Kumar* court also distinguished the respondent's civil immigration confinement in that case from even pretrial detention because, in contrast to civil immigration detentions, "there is a possibility of incarceration" in pretrial detentions. *Kumar*, 402 F. Supp. 3d at 384. Nonetheless, the Court finds that the Supreme Court's discussion in *Bell* on confinement dispels any doubt as to any significant difference between pretrial and civil immigration detentions:

> [C]onfinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, *the purpose of the facility is to detain.* Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortable as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

*Bell*, 441 U.S. at 537 (emphasis added). Put differently, detentions in the civil immigration context are substantially similar to those in the pretrial context because, while both result in the loss of freedom of choice and privacy of the detainees, the detentions themselves are not designed to punish, but only to ensure the detainees' presence at their respective impending proceedings. *See infra.* Whether a pretrial detention may result in incarceration for purposes of punishment is as relevant to the instant inquiry as whether a civil immigration detention may result in the denial of relief and deportation. As mentioned *infra*, the only issue before the Court is the constitutionality of the Government's administration of these involuntary procedures during civil immigration detentions, not the constitutionality of such detentions.

other legitimate governmental purpose." *Id.* at 538. Such a balancing test "accommodates the Government's 'substantial interest in ensuring that persons accused of crimes are available for trials,' while respecting a pretrial detainee's constitutional 'right to be free from punishment.'" *Est. of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 467 (5th Cir. 2015) (quoting *Bell*, 441 U.S. at 534). Thus, the Supreme Court held that a condition or restriction of pretrial detention will be constitutional as long as it is reasonably related to a legitimate governmental objective such that it does not, without more, amount to punishment. *Bell*, 441 U.S. at 539. "Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court may permissibly infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.*

The Supreme Court also noted that, in determining whether restrictions or conditions are reasonably related to the Government's interest in operating the detention center, courts must remember that such considerations are peculiarly within the province and professional expertise of the officials managing the detention centers. *Id.* at 540 n. 23. Hence, while the essential objective of pretrial confinement is to ensure the detainees' presence at trial, that such objective is not "the *only* objective that may justify restraints and conditions once the decision is lawfully made to confine a person." *Id.* at 540 (emphasis in original). The Government has other legitimate interests stemming from its need to manage the facility in which the individual is detained, including operational concerns that "may require administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial," such as maintaining security and order at the institution. *Id.*

With that in mind, the Supreme Court in *Bell* upheld all of the detention center's practices that were challenged, including the detention center's most intrusive practice: requiring detainees

to expose their body cavities for visual inspections as a part of a strip search conducted after every contact visit with a person from outside the center. *Id.* at 558. In upholding this intrusive practice, the Supreme Court balanced the significant and legitimate security interests of the detention center against the privacy interests of the detainees to hold that these visual body-cavity inspections could be conducted on less than probable cause. *Id.* at 560.

That is why, the Court concludes that the instant case can be better analogized to *Bell* than to either *Youngberg* or *Turner*. Here, as in *Bell*, the issue before the Court is not whether Respondent's civil detention is unconstitutional. *See Demore v. Kim*, 538 U.S. 510, 523 (2003) (noting that detention during deportation proceedings is a constitutionally valid aspect of the deportation process). Therefore, the Court must only address the constitutionality of administering involuntary medical care, hydration, and nutrition to Respondent—a civil immigration detainee—pending his deportation proceedings. Just as the essential objective of pretrial confinement is to ensure the detainees' presence at trial, the essential objective of confinement during deportation proceedings is to ensure the detainees' presence pending a determination of removability. Further, as in pretrial confinement, the Government has similarly other legitimate interests stemming from its need to manage the facility in which civil immigration detainees are detained, including operational concerns that "may require administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at [the time of removal]." *Bell*, 441 U.S. at 40.

On that basis, to decide the Government's likelihood of success on the merits, the Court must determine whether the ICE policy of administering involuntary medical care, hydration, and nutrition to Respondent is reasonably related to a legitimate governmental objective such that it does not amount to punishment *Bell*, 441 U.S. at 538–39.

**2. *Applying Bell, the ICE Policy of Administering Involuntary Medical Care, Hydration, and Nutrition, On Its Face, Does Not Amount to Punishment.***

In its motion, the Government states that "ICE is responsible for providing [Respondent] with such basic necessities as food and medical care" and "a responsibility to maintain order and safety." Govt's Ex Parte Mot. at 4 (citing 8 U.S.C. § 1231(f); 8 C.F.R. § 241.2(a)). ICE policy also "requires detainees to receive appropriate and necessary medical care." *Id.* at 11 (citing 2011 Operations Manual ICE Performance-Based National Detention Standards § 4.3 (revised 2016) [hereinafter "ICE Detentions Manual"]). In accordance with such duties, if a detainee is on hunger strike—has not eaten for 72 hours—and ICE medical staff has taken reasonable efforts "to educate and encourage the detainee" to resume to eat and drink and accept treatment voluntarily, but the detainee still refuses to do the same, then ICE policy allows involuntary medical care, hydration, and nutrition "only after the [clinical medical authority] determines [that] the detainee's life or health is at risk." ICE Detentions Manual § 4.2.

Further, the ICE Detentions Manual's section on hunger strikes outlines in detail each of the expected practices that ICE staff must take before administering any such involuntary procedures to the detainees on hunger strike. Specifically, the section establishes steps for each stage of the hunger strike: (1) the detainee's initial referral (determining whether the detainee's action is reasoned and deliberate); (2) the detainee's initial medical evaluation and management (evaluating the detainee's physical and mental condition); (3) measuring the detainee's food and liquid intake and output; (4) recording the detainee's refusal to accept medical treatment and seeking authorization for involuntary procedures (seeking authorization via court order to administer the procedures). *Id.*

On its face, this ICE policy does not seem geared towards punishing detainees who are on a hunger strike protesting their detention. In fact, quite the opposite: the ICE policy is geared

towards "protect[ing] [the] detainees' health and well-being by monitoring, counseling and providing appropriate treatment." *Id.* Moreover, this policy serves several compelling—not merely legitimate—governmental interests, "such as the preservation of life [and] prevention of suicide[.]" *Grand Jury Subp. John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998). While "[f]ree people who are sane have a liberty interest in refusing life-saving medical treatment, . . . and likewise in refusing to eat, . . . [detainees] don't have such an interest, or it is easily overridden." *Freeman v. Berge*, 441 F.3d 543, 547 (7th Cir. 2006) (Posner, J.); *see also Kumar*, 402 F. Supp. 3d at 384 ("The [Government's] interest in preventing the death of an individual in its custody is paramount."). In achieving such compelling interests like the preservation of the detainees' lives, the policy also serves other legitimate interests, such as ICE officials avoiding exposure to lawsuits by the detainees' estates because "[r]eckless indifference to the risk of a [detainee's] committing suicide is a standard basis for a federal civil rights suit." *Freeman*, 441 F.3d at 547. *see also Kumar*, 402 F. Supp. 3d at 384 ("[A]llowing Respondent to starve himself to death would violate the obligations the United States owes as a custodian." (citing *Aamer v. Obama*, 953 F. Supp. 2d 213, 221 (D.D.C. 2013), *aff'd on other grounds*, 742 F.3d 1023 (D.C. Cir. 2014)).

Therefore, the Court concludes that the ICE policy of administering involuntary medical care, hydration, and nutrition to detainees, on its face, is reasonably related to a legitimate governmental objective such that it is does not amount to punishment.

### 3. But, the ICE Policy of Administering Involuntary Medical Care, Hydration, and Nutrition as Applied to Respondent, Hardly Does Not Amount to Punishment.

However, merely because the ICE policy on its face does not amount to punishment will the Court find that the Government has a substantial likelihood of success on the merits to extend the order of authorization. The delicate balance of personal liberty and governmental interests

implicated here necessitates a close review of the circumstances surrounding the application of the ICE policy to Respondent. Indeed, the Government's motions to extend the authorization will not be rubber-stamped to allow an "indefinite" administration of involuntary medical care, hydration, and nutrition to anyone in ICE custody.[9]

After careful review of the record, the Court concludes that the Government barely established that the ICE policy, as applied to Respondent, does not amount to punishment. In reaching its conclusion, the Court evaluates the Government's expert witness and Respondent's treating physician, the ICE Doctor, and Respondent's medical expert, Dr. Parmar. Decisions made by the ICE medical staff on Respondent' case are presumptively valid because courts should not "second-guess the expert administrators on matters on which they are better informed." *Bell*, 441 U.S. at 544. Still, these decisions will be ruled invalid when there is a "substantial departure from accepted professional judgment, practice, or standards . . . demonstrat[ing] that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323.

Respondent missed his first meal on November 19, 2019 and ICE placed on him official hunger strike protocol after he missed his ninth meal on November 22, 2019. Govt's Ex Parte Mot., Ex. 2 ¶ 4. From that date, the ICE Doctor and the medical staff at the ICE facility monitored and evaluated Respondent's medical status daily, conducting weekly laboratory examinations of his blood work, his urine, and overall physical and mental health. *Id.* ¶¶ 5–8.

---

[9] As explained in footnote 6 *supra*, while the ICE policy may be rationally related to a legitimate government interest such that it does not amount to punishment, the administration of these involuntary procedures must still be curtailed in duration because such procedures are temporary infringements upon the civil immigration detainees' liberty under emergency circumstances prompting invasive intervention by the Government to avoid serious harm to the detainees' themselves. *In re Saenz*, 728 N.W.2d at 775–76. These respondents must be afforded an opportunity to be heard and challenge the injunction at evidentiary hearings pursuant to due process. *Eisenberg*, 654 F.2d at 1112–13.

After only two weeks of starting his hunger strike, Respondent met the criteria for a diagnosis of malnutrition because he lost about 15.5% of his weight and his vital signs were abnormal, indicating severe orthostatic hypotension.[10] *Id.* ¶ 10. Respondent was sent to a local hospital for hypotension and secondary evaluation on December 3, 2019, but he still refused to submit for medical examination, other than to provide a blood draw for lab testing, and refused to drink or eat. *Id.* ¶ 9. On December 6, 2019, the ICE Doctor, in her professional medical judgment, requested a court order seeking authorization to administer involuntary medical care, hydration, and nutrition because Respondent had reached a point where he required "medical intervention to provide the hydration and nutrient requirements he need[ed] to prevent further deterioration and serious medical complications" that were life threatening. *Id.* ¶ 13.

In her report, Dr. Parmar did not contest that Respondent's hunger strike weakened his medical condition to the point that the hunger strike posed a risk to his life. *See generally* Parmar Report. But after reviewing nearly 680 pages-worth of medical records on Respondent's medical care during a 63-day period, Dr. Parmar concluded that ICE was providing Respondent with substandard medical care and not following its own hunger strike protocol. *Id.* at 5–8. In her review of the ICE medical records for those days before December 6, she found multiple instances of cursory medical notes and inconsistent and carelessly charted evaluations. *Id.* at 7. According to Dr. Parmar, such instances suggest that these evaluations may not have been done or done in a cursory manner because these records seem "cut and pasted" or "cloned." *Id.*

For example, Dr. Parmar noted that on November 15, 2019, the ICE Doctor saw Respondent for the first time and charted that his "mucosa are moist." *Id.* at 9. But such charting was inconsistent with that of the nursing staff on the same day, which noted that

---

[10] According to the ICE Doctor, "[a] 5% weight loss from baseline in 1 month or a 7.5% weight loss from baseline within three months is considered diagnostic for malnutrition." *Id.* ¶ 10.

Respondent had dry mucosa consistent with dehydration. *Id.* This inconsistency also indicates an incongruency with the ICE Doctor's testimony at the hearing that she and the nursing staff communicate daily about Respondent's medical condition. Dr. Parmar also noted that on November 18, 2019, the nursing staff consistently charted normal results from Respondent's exams that day, despite Respondent showing signs of worsening hypotension and moderate-to-severe dehydration. *Id.* at 10. In yet another instance, Dr. Parmar noted that on November 30, 2019, despite Respondent's critically low blood pressure and a high heart rate when standing, the nursing staff charting suggested that he was able to walk easily and had "moist mucous membranes", a charting that was later cloned for nursing assessments made later that day. *Id.* Notably, Dr. Parmar's report also noted that the medical staff's charting shows inconsistent and incorrect notations about Respondent's primary language: one day stating that his primary language is "Spanish," on another day that it is "English and Hindi", and on yet another it is "English, Spanish, or Punjabi," when Respondent's primary language is Nepali and, according to counsel, he is limitedly proficient in English. *Id.* at 9, 10, 12.

While these oversights, by themselves, do not indicate that the ICE policy as applied to Respondent amount to punishment, these oversights suggest the ICE medical staff's inattention to the details of Respondent's medical condition, and thus, to the ICE policy. *See, e.g.*, ICE Detentions Manual § 4.2, ¶ 3 ("The detainee's health shall be *carefully monitored and documented*, as shall the detainee's intake of foods and liquids.") (emphasis added); *id.* ¶ 9 ("The facility shall provide communication assistance to detainees . . . who are limited in their English proficiency (LEP). . . . The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities. . . . Oral interpretation or

assistance shall be provided to any detainee who speaks another language in which written material has not been translated[.]").

After the Court granted the Government's order seeking authorization on December 6, 2019, Respondent was admitted into the First Hospital for the NG tube placement and he began receiving involuntary nutrition the following day. ECF No. 12 at 1. On December 11, 2019, Respondent was transferred back to the ICE facility where he received two nutritional Boosts per feeding, four times per day and his condition remained stable, according to the Government's advisories. ECF No. 23 at 2. But on December 23, 2019, Respondent was immediately transferred to the Second Hospital after his respiratory rate dropped to approximately one-third of its normal rate and fainted during a blood draw. *Id.* At the hearing, the ICE Doctor and ICE Expert both testified that they believed Respondent fainted because of his emotional response to the needle during the blood draw. Respondent was discharged from the Second Hospital on December 26, 2019. *Id.*

But, in her review of the medical records for that same period of time, Dr. Parmar disagreed with the Government's assertions in its advisories on Respondent's condition. Parmar Report at 7. She also observed that ICE provided inadequate amounts of IV fluid to Respondent and that the records only show that the ICE Doctor saw Respondent five times in over two months. *Id.* First, Dr. Parmar noted that, after his return to the ICE facility, Respondent's abdominal pain, dizziness, and vital signs suggested continued dehydration and inadequate resuscitation at both, the First Hospital and the ICE facility. *Id.* at 12. Particularly, she noted that Respondent was at an increased risk for infection as a result of the effects of starvation on his now weak immune system, a risk that revealed itself in the form of a fever when Respondent had a temperature of 100.6 on December 12, 2019—only a day after he returned to the ICE

facility. *Id.* While nursing staff charted Respondent's temperature on this day, the ICE medical staff did not transfer him to an emergency department and failed to monitor his medical condition with a higher degree of suspicion. *Id.* at 12–13.

Further, Dr. Parmar disputed ICE's characterization of Respondent's "fainting" on December 23, identifying it instead as a loss of consciousness signaling a near death condition. *Id.* at 14. She observed that, looking back at the records before the December 23 episode, the records show that ICE failed to acknowledge the warning signs leading to the episode, including: the nursing staff charts indicating that Respondent had "no need for IVF (intravenous fluid)" because Respondent was asked to drink one liter of fluid, when his vital signs showed clear evidence of dehydration; that Respondent's blood pressure became critically low; and that he had a five-pound weight loss due to severe dehydration and inadequate use of court ordered IV fluids and NG feeding. *Id.* at 13–14.

However, Dr. Parmar noted that, during the two days that he was hospitalized at the Second Hospital, Respondent received appropriate medical care because the Second Hospital provided him with more aggressive resuscitation with IV fluids, and identified that he had low magnesium for which he was at risk for refeeding syndrome. *Id.* at 14. For that reason, the Second Hospital involved a nutritionist to prescribe an appropriate diet and closely monitor Respondent's nutrition. *Id.* But after Respondent was released and the nutritionist made specific hydration and feeding recommendations to the ICE medical staff, these recommendations were not followed, and Respondent's vital signs became abnormal once again. *Id.* at 14–15. For the days that followed, until December 30—the last day worth of medical records that Dr. Parmar reviewed, Dr. Parmar observed similar concerns with Respondent's low blood pressure and abnormal vital signs. *Id.* at 15.

Finally, Dr. Parmar also observed that medical records show that the ICE Doctor only saw Respondent five times in over two months, on average once every twelve days. *Id.* at 6, 7. At the hearing, the ICE Doctor testified that such observation was untrue because she, in fact, saw Respondent at least three times a week. The ICE Doctor testified that the reason that the medical records do not show all her other visits is because these interactions were informal in nature. But regardless if the visits were formal or informal, the ICE Doctor, per the ICE Detentions Manual, was required to record all of her interactions with Respondent. ICE Detentions Manual § 4.2, ¶ 9 ("Records shall be kept of *all interactions with the striking detainee*, the provision of food, attempted and successfully administered medical treatment, and communications between the CMA, facility administrator, and ICE/ERO regarding the striking detainee.") (emphasis added).

On January 7, 2020, Respondent had low blood pressure and was transferred again to the Second Hospital as a precautionary matter. ECF No. 23 at 2. Respondent's lab results from the Second Hospital showed no signs of anemia or leukocytosis, and his creatinine and electrolyte levels were normal. *Id.* After Respondent was given one liter of IV fluids, he was discharged back to the ICE facility that same day, where his condition remained stable, according to the Government. *Id.* Results from medical tests done at the ICE facility that day showed similar results to those from the Second Hospital and minimal weight gain. *Id.* 2–3.

According to the Government's advisories, Respondent's vital signs and lab results remained normal during the following days, and on January 13, 2019, Respondent was transferred to the First Hospital to get his NG tube replaced, although without a medical doctor present. *Id.* at 3. At the hearing, the ICE Doctor testified that she talked to Respondent to try to convince him to drink the Boosts so that the NG tube could be taken away and there was no need

to get it replaced, but Respondent still refused.[11] The ICE Doctor also testified that Respondent was taken to the First Hospital as an accommodation to Respondent after he asked her if it was possible for him to get his NG tube replaced with one of the same size he had at that time. The ICE Doctor testified that Respondent preferred the 12-french NG tube that the First Hospital had to the 16-french tube that he would have received if the replacement had taken place at the ICE facility. Respondent then remained at the First Hospital the two weeks that followed, where his vitals remained stable and he only reported a cough with blood-tinged phlegm due to irritation to his throat as a result of the new NG tube. *Id.* at 4. At the hearing, the ICE Doctor testified that she chose to keep Respondent at the First Hospital because she became ill with the flu and did not want to spread it to Respondent in his weak state.

Overall, the Court finds that the decisions made by the ICE medical experts on Respondent's case are valid because the record does not indicate that the ICE medical staff "substantial[ly] depart[ed] from accepted professional judgment, practice, or standards" to the point that it "demonstrat[ed] that [they] actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323.

However, the Court finds that the record contains numerous instances that raise concern in how ICE medical staff is applying the ICE policy in Respondent's case. For instance, at the hearing, the ICE Doctor testified that Respondent's condition has been of special concern to her because of his rapid weight decline and low body mass index within that short period of time, which she had never seen before. Further, the ICE Doctor testified that it was not typical for a hunger striker to pass the six-week mark and that she could not recall how many times it had happened in the past. Yet, the ICE Doctor's care of Respondent did not seem to vary from its

---

[11] According to the ICE Doctor, if Respondent were to drink the Boosts voluntarily, he would still be technically on hunger strike without the use of an NG tube.

usual pattern, even when his vital signs, weight, or temperature appeared to fluctuate. Such was the case when, for example, he had a body temperature of 100.6 on December 12 and he was not evaluated for a fever or an infection or taken to emergency services, or also, when she could have followed the hydration and feeding recommendations of the nutritionist from the Second Hospital, especially after Respondent's condition improved during his stay there compared to how his condition has been while at the ICE facility.[12]

Additionally, despite Respondent's atypical symptoms that the ICE Doctor had never seen before and the fact that the ICE Doctor and the ICE Expert both conceded that placement of an NG tube is a potentially dangerous situation under all circumstances, Respondent's NG tube was still replaced without a medical doctor present to personally supervise the procedure. ECF No. 23 at 3. However, the Court does recognize that the ICE Doctor accommodated Respondent's desire to have an NG tube replacement that was smaller in diameter by taking him to the First Hospital.

But nonetheless, the explanation that Respondent "fainted" on December 23 because of his emotional reaction to the needle during the blood draw seems highly unlikely, especially considering that ICE medical staff had performed at least five prior blood draws, once each week, since the start of his hunger strike without any such incidents. *See* Govt's Ex Parte Mot., Ex. 2 ¶ 5. ("We have conducted weekly laboratory examinations of his blood work."). If Respondent's fainting was a vasovagal syncope—the technical term used by the ICE Expert to explain Respondent's fainting due to the needle, then his syncope should have been a temporary, rapid loss of consciousness that was followed by a fairly rapid and complete recovery. Harvard

---

[12] Indeed, since Respondent's discharge from the First Hospital on January 27, 2020, he has gained 6.6 pounds at the ICE facility after the nutritional content of his meal replacement feedings was increased and he was started on a continuous IV. ECF No. 33 at 4–5; ECF No. 34 at 5.

Health Publishing, *When the lights suddenly go* out, Harvard Medical School (Aug. 2009), https://www.health.harvard.edu/heart-health/when-the-lights-suddenly-go-out. However, the record does not indicate that Respondent's loss of consciousness was short-lasting, but instead, that Respondent had to be transferred to the Second Hospital and that his respiratory rate dropped to approximately a third of its normal rate.

If the monitoring of the detainees' condition and the administration of the delicate involuntary procedures at issue here are carelessly handled by ICE, they may result in the denial of medical care and the infliction of unnecessary pain and suffering on detainees on hunger strike. Since the Supreme Court has previously indicated that the infliction of unnecessary pain and suffering resulting from the denial of care serves no legitimate interest in the prisoner context, then all the more reason for the same conclusion to apply in the civil immigration context. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose."). Hence, if a careless application of these delicate involuntary procedures under the ICE policy will not serve a legitimate governmental interest, then a court may infer that such application of the policy may amount to punishment, and thus, that it is unconstitutional. *Bell*, 441 U.S. at 539.

Nevertheless, the Court finds that while these instances of inattention raise some concern, they still do not amount to punishment so as to result in an effective denial of care and render the application of the ICE policy to Respondent unconstitutional. In an effort to reduce Respondent's unnecessary pain and suffering, without unduly burdening the Government's legitimate efforts to preserve Respondent's life through the application of its policy, the Court will order the Government to alter certain specific conditions and to appraise the Court of

compliance with ICE policy and medical standards of care. To be sure, "interference by the federal judiciary with the internal operations of these institutions should be minimized" and "there is certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions." *Youngberg*, 457 U.S. at 323 (citing *Bell*, 441 U.S. at 544). But "[a]s the scope of governmental action expands into new areas creating new controversies for judicial review, it is incumbent on courts to design procedures that protect the rights of the individuals without unduly burdening the [Government's] legitimate efforts . . . to deal with difficult social problems." *Parham v. J.R.*, 442 U.S. 584, 608 n. 16 (1979).

### C. Substantial Threat of Irreparable Injury

The Fifth Circuit has explained that "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). Here, the irreparable injury is the loss of Respondent's life, which, clearly, cannot be undone through monetary remedies. As discussed *supra*, there was no dispute that Respondent's hunger strike weakened his medical condition to the point that the hunger strike posed a risk to his life. Respondent has also stated that he will continue with his hunger strike until he is released from ICE custody. Govt's Ex Parte Mot. at 3. With his BIA appeal currently pending and no information as to its resolution date, *id.* at 1, and the inherent irreparability in the loss of life and the resultant burden on the United States to employ extraordinary measures to care for Respondent, the Court finds that the Government has established a substantial threat of irreparable harm.

### D. Weighing of Harms and Public Interest

In balancing the harms at issue here, the Court concludes that the Government has established that the balance tips in its favor. As discussed *supra*, the Government's interest in

preventing the death of Respondent is paramount, and allowing Respondent to starve himself to death would violate the obligations the United States owes as his custodian and exposes the Government to potential lawsuits. *Kumar*, 402 F. Supp. 3d at 384; *Freeman*, 441 F.3d at 547. Further, as a detainee under the ICE custody, Respondent does not have a liberty interest, and even if so, it is easily overridden, in refusing-life saving medical treatment or refusing to eat. *Kumar*, 402 F. Supp. 3d at 384; *Freeman*, 441 F.3d at 547. Accordingly, the Court concludes that it is in the public interest to grant the Government injunctive relief until one day after the next evidentiary hearing or for thirty days, whichever date comes first.

### III. CONCLUSION

The Court recognizes that, ironically, the administration of involuntary medical care, hydration, and nutrition in itself can also potentially place Respondent's life at risk, as the ICE Doctor and ICE Expert testified at the hearing. Respondent is on hunger strike because he wishes to protest his detention pending his BIA appeal. The Government, through the Attorney General, could release Respondent on bond to end his hunger strike and avoid his death and any consequential exposure to liability. 8 U.S.C. § 1226(a)(2). However, the Court does not have any statutory authority to do the same because the decision to release Respondent rests entirely in the discretion of the Attorney General. 8 U.S.C. § 1226(e).

But also, the Court recognizes that the Government has its own interest in not releasing every single detainee, including Respondent, on bond. 8 U.S.C. § 1182(d)(5)(A) ("The Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States . . . ."). The date of removal for some detainees might be imminent, while for others, their removal date might be highly

-31-

uncertain and could take years to arrive. Further, were the Government to start releasing those detainees on hunger strikes on bond for fear of liability, then every detainee would have an incentive to become a hunger striker. Since each detainee's case before the immigration courts and the circumstances surrounding each detainee's potential removal are unique, no clear-cut method exists to predict how long a federal court can continue to extend an order for authorization of these involuntary procedures.

This dilemma places federal courts in an untenable predicament that offers two equally bleak options: either to continue extending authorization for indefinite force-feeding or to deny authorization and let detainees, whose removal date might be imminent, starve to death. Realistically, the first option is the only one that sensibly endeavors to preserve detainees' lives. In other words, the Court's hands are tied: it must continue to extend the Government's authorization indefinitely until either the Government gives in and releases a hunger striker on bond, or the hunger striker gives in and starts eating. But still, it only takes one misstep, either from the Government or the detainee on hunger strike, for the detainee to be at a critical state and die. To date, federal courts only have limited judicial enforcement mechanisms to solve this problem.

Until further guidance from the Fifth Circuit or the Supreme Court, the Court issues the following orders:

**IT IS HEREBY ORDERED** that the medical staff at DHS, ICE, EPC or other providers, who are under contract with ICE **SHALL**, under the appropriate standards of medical care consistent with clinical practice, continue administering non-consensual medical examinations (orthostatic blood pressure examinations, physical examinations, EKG, lab testing, and urinalysis), continue non-consensual hydration in the form of IV fluids, and continue non-

-32-

consensual nutrition in the form of NG tube placement with necessary enteral feedings, as needed for **thirty (30) days or until one day after the next evidentiary hearing,** whichever date comes first, to assure Mr. Bahadur's condition does not decompensate to a critical juncture.

**IT IS FURTHER ORDERED** that the ICE Doctor or an available competent medical doctor **SHALL** be physically present, during <u>all</u> NG tube placements (including replacements), performed by the medical staff or providers, to personally supervise, evaluate, and ensure that any such procedures are performed within the appropriate medical standards of care.

**IT IS FURTHER ORDERED** that the medical staff at DHS, ICE, EPC or other providers, who are under contract with ICE **SHALL** regularly consult with a certified nutritionist as to the appropriate daily hydration and nutrition required to maintain Mr. Bahadur's body weight. The medical staff at DHS, ICE, EPC or other providers, who are under contract with ICE **SHALL** follow all such recommendations from the nutritionist consulted.

**IT IS FURTHER ORDERED** that the United States of America **SHALL** provide, to Mr. Joseph Veith and the Court, along with its weekly advisories noted *infra*, written records of (1) the recommendations made by the nutritionist consulted, and (2) the details of the actions taken to implement the nutritionist's recommendations, including the precise amount of hydration and nutrition actually administered to Mr. Bahadur.

**IT IS MOREOVER ORDERED** that, if after the medical providers perform the involuntary medical examinations, hydration, and nutrition, the medical providers feel that in their medical judgment, more intrusive medical procedures are necessary to preserve the life and health of Mr. Bahadur, ICE **SHALL** seek further Court approval. In the event that Mr. Bahadur must be admitted to a hospital for any emergency medical treatment or monitoring, ICE Doctor and the medical staff or providers **SHALL** transfer Mr. Bahadur, or cause him to be transferred, to the

appropriate medical care facilities following standard medical emergency procedures without further Court approval.

**IT IS MOREOVER ORDERED** that the United States of America **SHALL** continue to appraise the Court on Mr. Bahadur's medical condition **on a weekly basis** for the duration of this matter, with an accompanying declaration from the ICE Doctor. The Court's order setting the next recurring status hearing is forthcoming.

So ORDERED and SIGNED this 27 day of February 2020.

DAVID C. GUADERRAMA
UNITED STATES DISTRICT JUDGE